**COMERICA INCORPORATED,**
a Delaware corporation,
Plaintiff,

v.

**FIFTH THIRD BANKCORP, a bank holding company, Fifth Third Bank, a Michigan charter bank, and Fifth Third Bank, an Ohio charter bank, Defendants.**

No. 02–71862.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 20, 2003.

Jeffrey G. Raphelson, Bodman, Longley,
Detroit, MI, Susan M. Kornfield, Bodman,
Longley, Ann Arbor, MI, for plaintiff.

Stuart A. Tompkins, Sullivan, Ward, Southfield, MI, Susan Artinian, Jill M. Wheaton, Dykema Gossett, Detroit, MI, for defendant.

**DECISION**[1]

COHN, District Judge.

## TABLE OF CONTENTS

I. Introduction ............................................................560
 A. Background ......................................................560
 B. The Preliminary Injunction ......................................560
 C. The Dissolution of the Injunction ................................561
 D. Decision .........................................................561

II. The Trial ..............................................................561
 A. The Witnesses ..................................................561
 B. The Exhibits ....................................................562
 C. A Difficulty ....................................................563
 D. Post–Trial ......................................................563

III. The Positions of the Parties ...........................................565
 A. Comerica .......................................................565
 B. Fifth Third .....................................................565

IV. Initial Findings .......................................................565

V. Analysis ...............................................................567
 A. Trademark Law Generally .......................................567
 B. Ownership and Continuous Use of the Mark ......................567
 C. Distinctiveness and Corresponding Protection ....................567
 D. Likelihood of Confusion .........................................568
 E. Likelihood of Confusion Factors ..................................569
 1. Strength of the Mark .......................................569
 2. Relatedness ...............................................570
 3. Similarity .................................................570
 4. Evidence of Actual Confusion ...............................571
 5. Marketing Channels ........................................571
 6. Customer Care and Sophistication ...........................571
 7. Intent ....................................................573
 8. Expansion of Product Lines .................................574
 9. Summary ..................................................574

VI. Conclusion ............................................................574

## ATTACHED EXHIBITS

Px2D a print advertisement by Comerica displaying Home Equity Flexline and Comerica on separate lines

Dx28 a print advertisement of Comerica displaying Comerica Home Equity FlexLine on a single line

Px18A a print advertisement of Fifth Third displaying Equity FlexLine and Fifth Third Bank on separate lines

Dx10 a print advertisement of Fifth Third displaying Fifth Third and Equity FlexLine on a single line

---

1. What follows are the findings of fact and conclusions of law required by Fed.R.Civ.P. 52.

Px10 a list of the 20 largest banks in Michigan offering a home equity loan product and the name under which it is marketed

Px11A a list of the use of FLEXLINE by banks in the United States offering a home equity line of credit

Px12 a list of the use of FLEXLINE to refer to products other than financial products/services

## I. Introduction

### A. Background

This is a trademark case claiming infringement in violation of section 43 of the Lanham Trade–Mark Act (the Lanham Act), 15 U.S.C. § 1125(a) and M.C.L.A. § 429.4(a).

Plaintiff Comerica Incorporated (Comerica) is a commercial bank headquartered in Detroit, Michigan with a major presence in the lower half of the lower peninsula of Michigan. It also operates in two other states. Defendants Fifth Third Bankcorp, Fifth Third Bank, a Michigan charter bank, and Fifth Third Bank, an Ohio charter Bank (collectively, Fifth Third) is a commercial bank headquartered in Cincinnati, Ohio with a significant presence in the lower peninsula of Michigan. It also operates in seven other Midwestern states.

Comerica asserts a prior right to the use of the trademarks FLEXLINE, EQUITY FLEXLINE, HOME EQUITY FLEXLINE and COMERICA'S HOME EQUITY FLEXLINE [2] in conjunction with the home equity loan product offered by both parties in the areas of Michigan in which the parties compete. A home equity loan product is basically a flexible line of credit secured by the borrower's equity in the borrower's home through a second mortgage.[3] Fifth Third, while recognizing Comerica's first use of the phrase FLEXLINE in Michigan, asserts Comerica has no ownership rights in FLEXLINE or any combination of words of which FLEXLINE is included as described above essentially because of the popularity of its use nationally by commercial banks in connection with offerings of retail lines of credit, including home equity loans, and particularly because there is no likelihood of confusion by potential borrowers in selecting either Comerica or Fifth Third.

### B. The Preliminary Injunction

Comerica filed suit on May 9, 2002, requesting injunctive relief and damages. On November 8, 2002, the Court held a hearing on Comerica's motion for a preliminary injunction. Because of the erroneous belief at the conclusion of the hearing that Fifth Third pirated the use of FLEXLINE upon coming to Michigan some two years after Comerica began its use, the Court issued a preliminary injunction on November 13, 2002. The injunction limited Fifth Third to the use of FLEXLINE as follows:

> ... when defendants publicly use in the lower peninsula of Michigan the phrase "FIFTH THIRD EQUITY FLEXLINE" in connection with a home equity line of credit loan product, all words

---

**2.** As will be discussed FLEXLINE, EQUITY FLEXLINE and HOME EQUITY FLEXLINE are not used as stand alone phrases. Also, on occasion the terms are in all capital letters and other times displayed with initial capital letters only. In this Decision the phrases will be displayed in all capital letters.

**3.** See GAO/GGD–98–169 High–Loan–To–Value Lending, a report of the United States General Accounting Office dated August 13, 1998.

must appear in the same typeface and size and on the same line of text and defendants shall not use the phrase "FIFTH THIRD EQUITY FLEX-LINE" in a manner that gives prominence to any one or more of these words over the others. This shall not apply to Fifth Third's web site.

On December 16, 2002, the parties by stipulation modified the injunction to allow Fifth Third greater flexibility in the use of FLEXLINE.

### C. The Dissolution of the Injunction

On January 10, 2003, the Court held a one-day testimonial hearing.

On January 29, 2003, the Court, in a telephone hearing, said it would dissolve the preliminary injunction, stating:

> This injunction was issued after an evidentiary hearing in which the Court concluded that there was substantial evidence, . . . in the vernacular, that Fifth Third had cribbed Equity Flexline from Comerica and introduced it into this market in an effort to imitate Comerica. The evidence as it stands now . . . leads to the . . . tentative conclusion that its use of Equity Flexline was developed independently of Comerica's use and that it was developed to be used with all of its banking centers in a multistate area of which Michigan was one of them and at the time it acquired Old Kent it simply adapted . . .—its advertising . . . to conform with its advertising in other states, and since there's no indication that it targeted . . . Comerica's business in an effort to take business from Comerica [and] it appears that had all of this been known at the time that the prelimi-

nary injunction was signed it never would have been signed. [U]nder the circumstances I will sign an order dissolving the preliminary injunction.

On January 30, 2003, the Court entered an order to that effect.

### D. Decision

For the reasons which follow, Comerica will be denied relief and the case dismissed. The use of the housemark of each of the parties, i.e. COMERICA and FIFTH THIRD in either juxtaposition to FLEXLINE or in close proximity is sufficient to distinguish each party's home equity loan product. FLEXLINE has been used in the United States since 1993 by financial institutions offering retail lines of credit.[4] There is no customer confusion in Michigan as to the financial institutions using FLEXLINE. There is no exclusive right to use.

### II. The Trial

The trial record consists of the testimony and exhibits at the hearing on the preliminary injunction on November 8, 2002 and the one day testimonial hearing on January 10, 2003.

#### A. The Witnesses

##### 1.

Witnesses at the two days of hearings for Comerica included:

— Lori Richard—a senior employee of Comerica's outside advertising agency with supervisory responsibility for billing, buying, planning and production of Comerica's media advertising for its home equity loan product

---

**4.** The Court's search of the LEXIS makes it appear that FLEXLINE was first used by FHLB of Pittsburgh in 1991. A January 20, 1992 story in the Pittsburgh Business Times & Journal states:

> Last August the local FHLB introduced "Flexline." The program provides short

term, low-interest, no fee advances to FHLB members.

In the record, the first use of FLEXLINE for a retail line of credit appears to be by U.S. Bank of Washington, National Association, on February 11, 1993 (Dx27).

— Sharon Giannangeli—a senior Comerica employee and manager of Comerica's home equity loan product

— Marianne Winter—vice-president for marketing of Comerica and responsible for marketing Comerica's home equity loan product

2.

Witnesses for Fifth Third included:

— Larry Magnesen—marketing director for Fifth Third in Western Michigan familiar with the launch of Fifth Third's home equity loan product in Michigan

— Nancy Elkus—vice-president and manager of Fifth Third's consumer loan products which includes its home equity loan product

— Diane Matheson—a marketing specialist for Fifth Third and responsible for choosing FLEXLINE as the name for Fifth Third's home equity loan product

— Sarah Gutfreund—a vice-president of Fifth Third and responsible for converting the marketing systems of banks acquired by Fifth Third to its style of marketing

— Joseph Chapline—retail marketing manager for Fifth Third.

The Fifth Third witnesses testifying at the January 10, 2003 hearing came from Fifth Third's national headquarters in Cincinnati and testified from the perspective of Fifth Third's overall operations. Magnesen, however, who testified for Fifth Third at the November 8, 2002 hearing, and had no knowledge of such operations.

B. The Exhibits

1.

Comerica introduced thirty-eight exhibits into evidence. They included comprehensive examples of the advertising for its home equity loan product and use of FLEXLINE in print media, radio, television and the internet. They also comprised examples of amounts spent, customer response to the advertising including its volume of home equity loans, examples of the use of FLEXLINE by other than commercial banks for various credit products including home equity loans, and Fifth Third's advertisements for its home equity loan product and use of FLEXLINE. Also included was a detailed history of Fifth Third coming to Michigan through the acquisition of local banks, correspondence, and trademark applications by itself and Fifth Third.

2.

Fifth Third introduced twenty-eight exhibits into evidence which were generally similar to those introduced by Comerica.

3.

Following the January 10, 2003 hearing and at the Court's request, the parties lodged with the Court their pending applications with the United States Patent and Trademark Office for registration of FLEXLINE and COMERICA'S HOME EQUITY FLEX LINE by Comerica and FIFTH THIRD EQUITY FLEXLINE by Fifth Third. There is no need to go into detail of what each party states in its papers before the Trademark Office. Suffice to say that the pending applications and the parties' statements to the Trademark Office have no relevance to the issues in the case other than as admissions. The issues in the case are to be resolved by the legal principles relating to trademark rights under section 43 of the Lanham Act.

4.

Of particular significance to the decision here are the following exhibits:

— Px2D (copy attached)—a print advertisement by Comerica displaying Home Equity Flexline and Comerica on separate lines

— Dx28 (copy attached)—a print advertisement of Comerica displaying Comerica Home Equity FlexLine on a single line

— Px18A (copy attached)—a print advertisement of Fifth Third displaying Equity FlexLine and Fifth Third Bank on separate lines

— Dx10 (copy attached)—a print advertisement of Fifth Third displaying Fifth Third and Equity FlexLine on a single line

— Px10 (copy attached)—a list of the 20 largest banks in Michigan offering a home equity loan product and the name under which it is marketed

— Px11A (copy attached)—a list of the use of FLEXLINE by banks in the United States offering a home equity line of credit[5]

— Px12 (copy attached) alist of the use of FLEXLINE to refer to products other than financial products/services

— Dx21 (not attached)—a Trademark Search Report dated July 20, 2000 of the word FLEXLINE. It does not list Comerica

### 5.

There was no testimonial or documentary evidence introduced by either party as to customer response to media advertising, choice of bank, or confusion. Also, there was no evidence that FLEXLINE has a secondary meaning.

FLEXLINE is a shorthand way to call attention to a flexible line of bank credit and is descriptive of the intended purpose and feature of the banking service being offered.

### C. A Difficulty

A difficulty pervading this case is precisely what trademark is involved. Each party uses FLEXLINE in its advertising. While there are differences in each party's home equity loan product, overall each product is the same. FLEXLINE is used in advertising to attract a customer's attention to a bank offering a home equity loan product. FLEXLINE is always a part of the text of the advertisement, whether print, radio, television or the internet. FLEXLINE is not used as a stand alone phrase to reference an anonymous source.[6] Each advertisement whether print, radio, television or the internet also prominently displays the party's house mark, i.e. COMERICA or FIFTH THIRD.

The difficulty comes in the varying relationships between the party's house mark and FLEXLINE in the text of advertisements. Comerica sometimes uses FLEXLINE on the same line as COMERICA and other times in close proximity. Comerica also sometimes uses EQUITY FLEXLINE and HOME EQUITY FLEXLINE. Fifth Third does the same; although it appears Fifth Third always uses EQUITY FLEXLINE and not FLEX LINE.

### D. Post–Trial

### 1.

Post-trial the Court inquired of the parties:

I am confused about what the dispute in this case is about. Fifth Third says it is comparing the similarity between "Comerica's Home Equity Flexline" and "Fifth Third's Flexline" and the term

---

**5.** This list fleshes out a list of the same banks filed by Fifth Third in its initial brief filed August 22, 2002 in opposition to Comerica's motion for preliminary injunction.

**6.** *See Key West Fragrance & Cosmetic Factory, Inc. v. The Mennen Company,* 216 U.S.P.Q. 168, 170, 1982 WL 52022 (1982)("Trademarks are intended to designate a single, albeit an anonymous source.")

"flexline" is always used in conjunction with a party's house mark.

This seems to suggest that neither party uses "Flexline" as a stand alone word and that whether the word is "Flex Line" or "Flexline" is irrelevant as are the words "Home Equity Flexline" or "Home Equity Flex Line" and "Equity Flexline" or "Equity Flex Line."

While the house mark and "Flexline [etc.]" may not necessarily be continuous the house mark must be positioned such that the reader/listener/observer invariably must associate "Flexline [etc.]" with the house mark, i.e. either Comerica's or Fifth Third. Is that so?

Comerica responded:

Comerica has used, and continues to use, "Flexline," "Equity Flexline" and "Home Equity Flexline" as stand alone terms.

. . . .

. . . . In each of [the] advertising campaigns, there were references to Comerica but they were much less prominent than "Flex Line."

The first statement is not accurate. The second statement is accurate.

Comerica also said:

. . . that whether the mark is "FlexLine" or "Flex Line" is largely irrelevant for purposes of this litigation. . . . the marks "Flex Line," "FlexLine," "Home Equity Flex Line," "Home Equity FlexLine," "Equity Flex Line" and "Equity FlexLine" are all essentially identical for purposes of the likelihood of confusion analysis. In each case, "FlexLine" is the dominant portion of the mark. . . .

. . . .

and

. . . when Comerica or Fifth Third advertises its home equity line of credit, each must use its house mark to let the consumer know where to acquire the product. To this extent, both parties use their house marks in advertisements so that the reader/listener/observer will associate the FlexLine product with the company offering the product. . . .

In nearly every product advertisement, the name of the company offering the product must also appear in the advertisement at some point . . .

Fifth Third's response to the Court's inquiry stated:

Both parties use the word Flexline, Flex Line, *Flex* line, or similar derivative only in conjunction with their strong house marks. . . . "the house mark must be positioned such that the reader/listener/observer invariably must associate 'Flex line, etc.' with the house mark."
. . .

This dispute is about the use of the phrase FLEXLINE, not as a stand alone trademark, but in close proximity to the house mark of each of the parties. Therefore, the comparison for purposes of deciding the right to use is essentially between the use of the phrase FLEXLINE in close proximity to a housemark for a home equity loan product offered by a bank in Michigan.

2.

Each party also filed proposed findings of fact (without a table of contents) and a brief. Comerica filed a reply brief.

The post-trial filings were excessive particularly the proposed findings of fact. Comerica's proposed findings of fact contains 137 numbered paragraphs with simply too much text devoted to the extent of its advertising and the dollars spent promoting its home equity loan product and use of FLEXLINE in its varied forms of advertising. None of this is in dispute. While Fifth Third's proposed findings of fact runs only 31 numbered paragraphs they chose to include 85 pages of transcript. The reasons for this are not clear.

## III. The Positions of the Parties

### A. Comerica

Comerica places great emphasis on the amount of money it has spent in advertising its home equity loan product using FLEXLINE as part of each advertisement and the success of the product in the market place. Comerica argues that this success is largely due to the use of FLEXLINE in its advertising. Comerica concedes, however, that the expenditure of advertising money and the amount of its home equity loan product business is not related solely to the use of FLEXLINE (customers are attracted to Comerica presumably for a variety of reasons. The record is silent as to why a customer chooses Comerica over other banks). Comerica says:

> The use of the Flex Line mark is a valuable marketing tool that is designed to grab the Consumer's attention, generate interest in the product and attract consumers to a branch. This is precisely why 2 of the parties [each] have emphasized their mark in their advertisements for home equity line of credit.

> Comerica's expenditure of millions of dollars advertising a home equity line of credit under the Flex Line more educated the Michigan public about the benefits of a Flex Line home equity line of credit and created consumer familiarity with that term in Michigan.

> Comerica acknowledges that "by the time a person applies for a home equity line of credit with either party that person knows with whom he/she is dealing."

### B. Fifth Third

Fifth Third says:

Comerica suggests that all dollars spent on advertising its second mortgage product should count as an "investment" in the word Flexline. Comerica introduced absolutely no evidence from any expert or lay witness of any nexus between advertising dollars spent and value generated in the Flexline mark. In addition, the suggestion that *all* dollars generate *100%* value in the Flexline mark defies logic. Comerica was not simply advertising a word, but rather a product. The advertising did not focus on the word Flexline, but rather the features of the second mortgage product. Most importantly, squarely in line with the reasoning why there is no claim here, the advertising always featured the house mark "Comerica" as well, and promoted it as a bank with full and unique services. These dollars spent, and the growth in the product, cannot be presumed to be solely related to the use of the word "Flexline."

## IV. Initial Findings [7]

### 1.

FLEXLINE first appeared in the United States in advertising a retail line of credit on February 1, 1993 by United States Bank of Washington, D.C. relating to its promotion of credit financing. Over the years since multiple banks have used FLEXLINE in advertising retail financial products including home equity loan financing.

### 2.

Comerica began using FLEXLINE in August 1998 with the launch of a new home equity line of credit. The press release announcing the launch stated in its headline "Comerica Bank to Introduce Home Equity Flexline" and used that phraseology throughout the release. While Comerica appears to argue its use of FLEXLINE was an original thought, such is not the case. Since August 1998, Comerica has extensively advertised its home

---

**7.** Additional findings are included in Part V, *infra*, without being so denominated.

equity loan product in print media, radio, television and on the internet. It has spent several millions of dollars doing so and has found its home equity loan product to be a profitable source of business. All Comerica advertisements in whatever form feature FLEXLINE as a part of the text. Comerica has no consumer surveys or marketing opinions as to consumer perception and associations of FLEXLINE with its house mark COMERICA. Comerica has no customer surveys or other data to establish precisely what it is about Comerica's advertisements of its home equity loan product that accounts for its success or what it is in the advertisements that accounts for the business they presumably attract. Each time a customer obtains a home equity loan he or she (or both) must come to a Comerica branch. There is a fair amount of paperwork to process. The customer has three days after signing the necessary papers to rescind the transaction.

More particularly, Sharon Giannangeli testified as follows: [8]

> FIFTH THIRD COUNSEL: ... is it your understanding that on this third page of Exhibit 28 the use of the Comerica logo a couple of inches away from Home Equity Flexline is close enough proximity to distinguish it from anybody else's Home Equity Flexline?

> . . . . .

> THE WITNESS: Yes.

> THE COURT: You wouldn't expect if you were just advertising Flexline, ..., home equity loans, ... that people would know it was Comerica?

> THE WITNESS: Correct. It would have to be in the context of some document that has the Comerica logo on it, yes.

> THE COURT: ... You would never think of advertising Flexline, call a telephone number, period.

> THE WITNESS: Not unless the Comerica logo was with that, ...

> THE COURT: ... And so people would know that it was Comerica they were contacting?

> THE WITNESS: Right.

> . . . . .

> THE COURT: You don't have these big signs easy credit, call a telephone number period, right?

> THE WITNESS: Correct.

> THE COURT: ... You always have Comerica so they know it's Comerica:

> THE WITNESS: Yes.

3.

Fifth Third operates banks in eight states in the Midwest. Its headquarters staff in Cincinnati exercises a significant amount of control over each state's operations. Advertising is generally uniform throughout the eight states. Fifth Third began a program of acquiring banks in Michigan, principally in the western half of the lower peninsula, in 1999. Fifth Third began the use of FLEXLINE in advertising its home equity loan product in April 2001. The press release announcing the launch is headed "Fifth Third Bank Launches Equity Flex Line." For more than a year prior Fifth Third extensively researched the advisability of offering a home equity loan product and the best name to use in its advertising including a trademark search and on advice of counsel. All of the work was done in Cincinnati including a trademark search and on advice of counsel. There is no evidence that Fifth Third sought to trade on Comerica's use of FLEXLINE or was even aware of

---

**8.** January 10, 2003 Transcript at p. 96–97.

Comerica's use of the phrase. Fifth Third also asserts the use of FLEXLINE was an original thought. Again, this is not the case.

## V. Analysis

### A. Trademark Law Generally

#### 1.

Generally speaking, trademark law is intended primarily to benefit the consumer. As stated in 3 J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 2:33:

> Trademark law insures that brand information received by the consumer is accurate: "By insuring correct information in the market place, the [trademark] laws reduce losses caused by misunderstanding and deceit and they permit consumers and merchants their own welfare confident that the information presented is truthful." (citation omitted)

*See also Qualitex Co. v. Jacobson Products Co., Inc.,* 514 U.S. 159, 163–64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) ("In principle, trademark law, by preventing others from copying a source-identifying mark ... 'reduce[s] the consumer's costs of shopping and making purchasing decisions.'" (citations omitted)).

#### 2.

The merits of the case are governed by section 43 of the Lanham Act, 15 U.S.C. § 1125(a),[9] which "was intended to make 'actionable the deceptive and misleading use of marks' and 'to protect persons engaged in ... commerce against unfair competition.'" *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 767–68, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (quoting § 45, 15 U.S.C. § 1127).

■ To establish a right under section § 1125(a), a plaintiff must show: (1) ownership and continuous use of a specific trademark in connection with specific services, (2) secondary meaning if the mark is descriptive, and (3) a likelihood of confusion among consumers resulting from defendant's use of its mark. *See Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1105 (6th Cir.1991). The standard is the same under Michigan law. *See Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 833 (6th Cir.1983); *Schreiber Mfg. Co. v. Saft America, Inc.,* 704 F.Supp. 759, 769 (E.D.Mich.1989); *Empire Nat. Bank of Traverse City v. Empire of America FSA,* 559 F.Supp. 650, 654 (W.D.Mich.1983).

### B. Ownership and Continuous Use of the Mark

Trademark ownership arises from actual use in the market, and priority of ownership stems from priority of continuous use. *Homeowners Group,* 931 F.2d at 1105. Fifth Third does not dispute that Comerica used FLEXLINE in its advertising for a home equity loan product first in Michigan or that it has done so continuously.

### C. Distinctiveness and Corresponding Protection

#### 1.

■ The level of trademark protection corresponds to the distinctiveness of the

---

9. Section 1125(a) reads in pertinent part:
(1) [a]ny person who ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ....
shall be liable in a civil action by any person who believes that he or she is likely to be damages by such act.

mark. A mark is entitled to trademark protection if it is inherently distinctive, or if it has acquired distinctiveness. *Two Pesos, Inc.*, 505 U.S. at 767–68, 112 S.Ct. 2753. "Marks are often classified in categories of generally increasing distinctiveness; ... (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Id.* at 768, 112 S.Ct. 2753 (citing *Abercrombie & Fitch Co. v. Hunting World Inc.*, 537 F.2d 4, 9 (2d Cir.1976)).

"Marks that constitute a common descriptive name are referred to as generic. A generic term is one that refers to the genus of which the particular produce is a species. Generic terms are not registrable ..." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) (internal citations omitted).

"Marks which are merely descriptive of a product are not inherently distinctive." *Two Pesos, Inc.*, 505 U.S. at 769, 112 S.Ct. 2753. Descriptive marks describe the qualities or characteristics of a good or service. *Park 'N Fly, Inc.*, 469 U.S. at 194, 105 S.Ct. 658. In general they cannot be protected, but a descriptive mark may be registered if it has acquired secondary meaning, "i.e., it 'has become distinctive of the applicant's goods in commerce.' " *Id.* at 194, 105 S.Ct. 658 (quoting §§ 2(e),(f), 15 U.S.C. §§ 1052(e), (f)).

"The latter three categories of marks, because of their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Two Pesos, Inc.*, 505 U.S. at 767–68, 112 S.Ct. 2753. Suggestive marks communicate something about the product without describing it. Fanciful marks are created by combining existing words, prefixes, and suffixes, to form a new words, such as the mark MICROSOFT. Arbitrary marks are pre-existing words that have no prior connection with the type of products with which they are being used, such as the mark APPLE for computers.

2.

■ Comerica asserts that FLEXLINE is an inherently distinctive mark, either because it is fanciful (a combination of two pre-existing words) or because it is suggestive. Fifth Third, in connection with its application for federal registration, argued that FLEXLINE is suggestive.

FLEXLINE is essentially a clever way of saying "flexible line of credit."

Since it is a made-up word, it is not generic or even merely descriptive. It is suggestive as it is meant to evoke the idea of a flexible line of credit, though the fanciful category also makes sense as it is a made-up combination of two words. Either way, FLEXLINE fits into a category that merits protection.

### D. Likelihood of Confusion

Likelihood of confusion is the most important consideration in deciding a trademark infringement case.

■ Under section 1125(a), a plaintiff may prevail if a defendant's use of a mark is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such persons with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." This element is determined by a consideration of the following factors: (1) strength of the plaintiff's mark, (2) relatedness of the goods or services, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) likely degree of purchaser care and sophistication, (7) defendant's intent in selecting its mark, and (8) likelihood of expansion of the product lines using the marks. *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir.1982).

■ These factors must be considered together and "imply no mathematical precision." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir.1988). The factors "are not immutable, but merely indicate the need for weighted evaluation of the pertinent facts in arriving at the legal conclusion of the confusion." *Frisch's Restaurants*, 759 F.2d at 1264. In fact, "a plaintiff need not show that all, or even most of the factors listed are present in any particular case to be significant." *Id.* The ultimate question is merely "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir.1997); *Homeowners Group*, 931 F.2d at 1107.

### E. Likelihood of Confusion Factors

#### 1. Strength of the Mark

##### a.

■ Likelihood of confusion increases with the strength of the mark. *Homeowners Group*, 931 F.2d at 1107. The strength of a mark is a determination of the mark's distinctiveness and degree of recognition in the marketplace. *Id.* "A mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of a wide and intensive advertisement, or because of a combination of both." Callman, *Unfair Competition, Trademarks & Monopolies*, § 20.43 (4th Ed.1983).

##### b.

Fifth Third has shown that FLEXLINE is being used in connection with banking services offered nationwide by at least twenty-two other banks, primarily with a home equity loan product. Fifth Third has also shown that FLEXLINE is being used in connection with products other than financial products. These uses in addition to the federal registration of FLEXLINE and FLEX LINE PLATINUM PLUS for financial services in the form of credit cards indicates that the mark is weak as it is commonly used. *See First Savings Bank F.S.B. v. First Bank Systems, Inc.*, 101 F.3d 645, 654 (10th Cir.1996) ("extensive third-party use of the disputed term indicates that the term itself deserves only weak protection").

##### c.

Comerica argues that "voluminous research results ... do not establish that [plaintiff's] marks are weak, because they do not reveal the scope of use of the other, similar marks." *Express Funding, Inc. v. Express Mortgage, Inc.*, 894 F.Supp. 1095, 1100 (E.D.Mich.1995). Instead, "[i]n order to be accorded weight a defendant must show what actually happens in the marketplace." *Id.* It argues that Fifth Third's internet findings do not indicate anything persuasive about the strength of Comerica's use of FLEXLINE. It also asserts that Fifth Third has not been able to find a registration for the mark FLEXLINE for a home equity loan product.

##### d.

This factor massively favors Fifth Third. FLEXLINE is popular in the banking industry as well as in the banking world, as it is a contraction of "flexible line of credit" that sounds simple and catchy. Although not all of the uses in the banking industry apply to a home equity loan product (e.g. the registered use for credit card services), these other uses create an atmosphere in which FLEXLINE is familiar to banking customer such that they would not necessarily associate it with any one particular bank. Importantly, FLEXLINE as a mark for a home equity loan product only makes sense to a bank customer, or poten-

tial bank customer, when associated with the house mark of the bank.

### 2. Relatedness

Relatedness is the most important inquiry in the likelihood of confusion determination. *Homeowners Group,* 931 F.2d at 1109. This factor seemingly favors Comerica since Fifth Third is offering a nearly identical service. When there is direct competition for services, confusion is considered likely if the marks are sufficiently similar. *Id.* at 1108. However, given the need to include the housemark of each of the parties in conjunction with the use of FLEXLINE the significance of the relatedness factor is significantly diminished.

### 3. Similarity

#### a.

■ In evaluation the similarity of trademarks, a superficial side-by-side comparison is not the appropriate test. *Wynn Oil,* 839 F.2d at 1188. Rather, "the marks must be viewed in their entirety and in context." *Homeowners Group,* 931 F.2d at 1109. "A court must determine, in the light of what occurs in the marketplace, whether the mark will be confusing to the public when singly presented." *Id.* (citations omitted).

The addition of words can be sufficient to distinguish marks. *See In re Hearst Corp.,* 982 F.2d 493 (1992) (finding presence of term GIRL in VARGA GIRL sufficient to distinguish from VARGAS for identical goods); *Frisch's Restaurants,* 759 F.2d 1261, 1266–67 (holding that the use of the Shoney's name over any subsidiary product line mark ... reduces the likelihood of confusion). Slight modifications of a mark do not necessarily preclude infringement, however. *See Induct–O–Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 363–64 (6th Cir.1984) (addition of "matic" does not distinguish the "induct-o-matic" from the trademark "inducto").

While in some situations use by a defendant of its corporate name in connection with a plaintiff's mark may be "an aggravation and not a justification, for it is openly trading in the name of another upon the reputation acquired by the device of the true proprietor," *Menendez v. Holt,* 128 U.S. 514, 521, 9 S.Ct. 143, 32 L.Ed. 526 (1888) (internal citations omitted), this circumstance has no application here and the contrary is true. Fifth Third uses FLEXLINE in juxtaposition or close approximation with its house mark FIFTH THIRD. Its name distinguishes it from Comerica. This is supported by the fact that Fifth Third's trademark application for FIFTH THIRD EQUITY FLEXLINE and Comerica's trademark application for COMERICA'S HOME EQUITY FLEXLINE have each been allowed over MBNA's FLEXLINE registration. In the banking world, consumers are used to seeing banks with similar names offer products with similar names. *See, e.g., Sun Banks of Fla. v. Sun Fed. Sav. and Loan,* 651 F.2d 311 (5th Cir.1981) and cases cited therein. *See also Worthington Foods, Inc. v. Kellogg Co.,* 732 F.Supp. 1417, 1441 (S.D.Ohio 1990) ("the display of a company's own familiar mark on a product reduces the likelihood of confusion which might stem from the simultaneous use of another's mark.")

#### b.

While the similarity factor would seem to favor Comerica if we were looking at FLEXLINE alone as the mark in dispute, it does not weigh in favor of Comerica, however, because the use of a house mark in conjunction with FLEXLINE has been clearly established. Banking is an industry in which customers are used to seeing very similar marks. As just observed, as the record stands there is no evidence that potential customers are not capable of dis-

tinguishing between Comerica and Fifth Third.

### 4. Evidence of Actual Confusion

#### a.

"Convincing evidence of significant actual confusion occurring under actual marketplace conditions is the best evidence of a likelihood of confusion." 3 J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.13. The absence of such evidence is not dispositive, however. *See Kraft General Foods, Inc. v. Allied Old English,* 831 F.Supp. 123, 130 (S.D.N.Y. 1993); *Wynn Oil,* 839 F.2d at 1188. A successful Lanham Act plaintiff need only show a sufficient potential of confusion, not actual confusion. *Daddy's Junky Music Stores,* 109 F.3d at 284. As stated in *Champions Golf Club, Inc. v. The Champions of Golf Club, Inc.,* 78 F.3d 1111, 1119 (6th Cir.1996):

Courts have consistently held that "evidence of actual confusion is undoubtedly the best evidence of a likelihood of future confusion." Nonetheless, "actual confusion is only one of several factors." Moreover, because such evidence is " 'difficult to produce and frequently discounted as unclear or insubstantial,' " the factor should be "weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available," Thus, absence of such evidence, in the usual case, is not weighted heavily against a plaintiff.

(internal citations omitted).

#### b.

As previously described, Comerica has offered no evidence that there is actual confusion in the marketplace. Importantly, Comerica has not shown that such evidence is not available (for example, polling data), and has not even attempted to show how prospective customers respond to its advertising and what it is in its advertising that attracts their attention. As stated in *Nabisco, Inc. v. P.F. Brands, Inc.,* 191 F.3d 208, 228 (2d Cir.1999):

If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be a powerful indication that the junior trademark does not cause a meaningful likelihood of confusion....

This factor weights heavily in favor of Fifth Third.

### 5. Marketing Channels

In the major portion of the lower peninsula of Michigan the parties compete for the same customers and they use the same advertising media. This factor favors neither party.

### 6. Customer Care and Sophistication

#### a.

Generally, in assessing the likelihood of confusion, the standard used by the courts is the typical buyer exercising ordinary care. *Homeowners Group,* 931 F.2d 1100. The standard may increase when the buyer has expertise or is otherwise more sophisticated as to the transaction at issue or when the services are expensive or unusual because, in these instances, the buyer is expected to use greater care. *Id.*

#### b.

Fifth Third correctly asserts that customers exercise a high degree of care in choosing banking services because acquiring a home equity line of credit is a major transaction. "[C]onsumers tends to exercise a relatively high degree of care in selecting banking services. As a result, customers are more likely to notice what, in other contexts, may be relatively minor differences in names." *First National Bank in Sioux Falls v. First National*

*Bank South Dakota,* 153 F.3d 885, 889 (8th Cir.1998); *see also Empire National Bank v. Empire of America FSA,* 559 F.Supp. 650, 655 (W.D.Mich.1983) (finding the mark Empire to be a weak mark when used in connection with financial services because banks and insurance companies have greater latitude in choosing corporate names).

#### c.

Comerica argues that consumers lack sophistication in choosing a bank and that Fifth Third is capitalizing on their lack to take advantage of Comerica's advertising campaign to its own benefit. Comerica argues that consumers are confused, and possibly intimidated by, the many financial loan offerings in the marketplace. For example, they say their "Dick and Jane" advertising campaign was meant to project a tone of simplicity and straightforwardness. They also say the many banking consolidations also confuse the public as to the source of their banking products. *See Champions Golf Club,* 78 F.3d at 1121. They therefore say that although banking customers may exercise care in choosing a bank, they are not sophisticated. What is wrong with this argument is that there are simply no proofs to support it in the record.

Comerica argues their customers may know with whom they are dealing at the time they sign Fifth Third's application forms, but may have begun their quest in response to Comerica's investment of millions in marketing, advertising, and customer service.

#### d.

The factor weighs heavily in favor of Fifth Third. The probabilities are that consumers are likely to exercise care in choosing a bank for a transaction which puts a second mortgage on their home.

■ However, Comerica's arguments that customers' lack of sophistication makes them susceptible to "initial interest" confusion requires some discussion.

Comerica argues that while it is true that a customer knows with whom it is dealing when he or she signs Fifth Third forms, they could have begun their quest for a home equity loan product in response to Comerica's advertising and cite *Dorr-Oliver, Inc. v. Fluid–Quip, Inc.,* 94 F.3d 376, 382 (7th Cir.1996) in support:

> the Lanham Act forbids a competitor from luring potential customers away from a producer by initially passing off its goods as those of the producer's even if confusion as to the source of the goods is dispelled by the time any sales are consummated. This "bait and switch" of producers, also known as "initial interest" confusion, will affect the buying decisions of consumers in the market for the goods, effectively allowing the competitor to get its foot in the door by confusing consumers.

The difficulty Comerica has in arguing "initial interest confusion" is again the difficulty it has had all along in making its case; there is simply no evidence of this likelihood. Eighty-four percent approximately of the home equity loans by Comerica and by Fifth Third originate with existing customers. The extent to which new customers are attracted by advertising is an unknown as to what has attracted them. Additionally, the cases which support the "initial interest confusion" syndrome are of a far different order than the situation here.

In *Blockbuster Entertainment Group v. Laylco, Inc.,* 869 F.Supp. 505, 513 (E.D.Mich.1994), the Court said:

> ... the issue in this case is the degree of likelihood that the name "Video Busters" would attract potential customers based on the reputation built by Blockbuster. That a customer would recognize that Video Busters is not connected

to Blockbuster after entry into a Video Busters store and viewing the Video Busters membership application, brochure, video cassette jacket, and store layout is unimportant. The critical issue is the degree to which Video Busters might attract potential customers based on the similarity to the Blockbuster name. The court finds that Video Busters might attract some potential customers based on the similarity to the Blockbuster name. Because the names are so similar and the products sold are identical, some unwitting customers might enter a Video Busters store thinking it is somehow connected to Blockbuster. Those customers probably will realize shortly that Video Busters is not related to Blockbuster but [u]nder the initial interest confusion rule that is irrelevant.

Here the application for a home equity loan must not only go to the premise of that bank making the loan and fill out a multitude of papers but also has three days following signing the papers to rescind the transaction.

Both *Brookfield Communications v. West Coast Entertainment Corporation*, 174 F.3d 1036 (9th Cir.1999), and *PAC-CAR, Inc. v. TeleScan Technologies, L.L.C.*, 319 F.3d 243 (6th Cir.2003), cited by Comerica, involved web site domain names, a wholly different situation than that involved here.[10] As pointed out in *Brookfield Communications*, 174 F.3d at 1057:

> In the internet context, in particular, entering a web site takes little effort—usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership.

*See also* Jason Allen Cady, Note: *Initial Interest Confusion: What Ever Happened To Traditional Likelihood Of Confusion Analysis*, 12 Fed. Cir. B.J. No. 4 at p. 643.

In sum, as observed in *Homeowners, supra*, at 1111:

> Selling [or mortgaging] one's property is likely the most significant commercial transaction ever undertaken for most people … customers are likely to carefully select the provider of sales [of mortgage] services.

### 7. Intent

#### a.

This factor asks whether the defendant adopted the mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between the defendants and the senior user's goods or services. *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir.1991). "If a party chooses a mark with the intent of causing confusion, that fact along may be sufficient to justify an inference of confusing similarity." *Wynn Oil*, 839 F.2d at 1189. "Where a second-comer acts in bad faith an intentionally copies a trademark or trade dress, a presumption arises that the copier has succeeded in causing confusion." *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 586–87 (2d Cir.1993). On the other hand, "[a]n 'innocent' or bona fide junior user … is one, we think, whose use is not attributable to intent to obtain a free ride on the reputation of the owner of the trademark." *Nalpac Ltd. v. Corning Glass Works*, 784 F.2d 752, 755 (6th Cir. 1986) (citing *Triumph Hosiery Mills, Inc. v. Triumph International Corp.*, 308 F.2d 196, 199 (2d Cir.1962)).

---

**10.** *See Niton Corp. v. Radiation Monitoring Devices, Inc.*, 27 F.Supp.2d 102 (D.Mass. 1998) (discussing the complexity of the internet world and trademark infringement regarding to use of a "META" description to infringe).

 Intentional infringement can be shown by circumstantial evidence. *Data Concepts, Inc. v. Digital Consulting, Inc.,* 150 F.3d 620, 626 (6th Cir.1998). "In determining a defendant's intent, 'actual or constructive knowledge' of the prior user's mark or dress may indicate bad faith. Where such prior knowledge is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, we have upheld finding of bad faith." *Paddington,* 996 F.2d at 587. However, mere knowledge of a plaintiff's name does not necessarily impute bad faith in the choice of a defendant's mark. *Wonder Labs Inc. v. Procter & Gamble Co.,* 728 F.Supp. 1058 (S.D.N.Y.1990).

b.

Here Fifth Third has clearly established that it was not aware of Comerica's use of FLEXLINE or of Comerica's advertising when it began use of FLEXLINE.

As the record stands there can be no dispute over the fact that Fifth Third established that it developed its use of FLEXLINE independently of Comerica.

8. Expansion of Product Lines

This factor is relevant where the goods and services of the parties are not identical but where they are somewhat related. *Jet, Inc. v. Sewage Aeration Systems,* 165 F.3d 419, 422 (6th Cir.1999). Here both parties already occupy the same field of a home equity loan product. This factor is irrelevant.

9. Summary

Comerica has not come anywhere close to establishing that there is a likelihood of confusion between the competing marks.

VI. Conclusion

Comerica has shown that FLEXLINE is a fanciful or suggestive mark albeit a weak mark, and so is worthy of some protection. Comerica has also shown continuous use of FLEXLINE, and a use which precedes that of Fifth Third, in the lower peninsula of Michigan. However, Comerica has not shown use of FLEXLINE as a stand alone mark but only in juxtaposition with the housemark Comerica or very close to it. The customer or potential customer is not confused when he or she observes FLEXLINE in juxtaposition or close to the housemark of Fifth Third. Simply put, Comerica has not shown either actual confusion or the likelihood of confusion. It is for this reason that this case is being dismissed.

SO ORDERED.

PLAINTIFF'S EXHIBIT 2D

We listen. We understand. We make it work.

Comerica is ready
2000

Comerica Bank. Member FDIC, Equal Opportunity Lender.

www.comerica.com

"The Introductory APR of 5.9% is for new accounts only and applies only to transactions that post to the account within 60 days from account opening date (the "Introductory rate balances"). This rate is effective through the last day of your statement cycle ending in February, 2000. For all other balances and for introductory rate balances after the last day of your statement cycle ending in February, 2000, the APR will vary monthly and will be based on the highest Prime rate as published on the 15th day of the preceding month in the Midwest Edition of the Wall Street Journal plus a margin. The margin will range from .25% to 4.0% based on your line amount, loan to value and prior credit history. A typical line size of $50,000 at 80% LTV as of Aug. 15, 1999 is Prime plus .50% or 8.75% APR. The maximum APR is 18%. Property insurance may be required. Property used to secure this loan must be your primary residence. A $50 fee will apply each time the fixed term payment option is selected. A 2.0% cash advance fee with a maximum of $15.00 is imposed on all ATM cash advances. *Consult your tax advisor regarding tax-deductibility.

MMI-00375

576

**DEFENDANT'S EXHIBIT 28**

| Home | Search | Site Index | Tools & Calculators | Basic E-Mortgage | Contact Us |

Stock Price: **48.81 +0.25**
About Comerica
Investor Relations
Online News

Need a mortgage fast?

Corporate Banking | Small Business | Personal Finance | Online Services

## Home Equity FlexLine Special Offer

### Comerica Home Equity FlexLine

**Personal Finance**
Checking Accounts
Savings Accounts
Time Deposits and
IRAs
Accessing Your
Accounts
Credit Cards
Private Banking
Mortgages
Loans and Equity
Home Equity Loans and
Lines of Credit
Home Equity Lines of
Credit
Fixed Equity Loans
Home Equity FlexLine
Which is Right For You?
What are the Costs?
What is the Maximum
Loan Amount I can
Apply for?
Home Improvement
Loans
Student Loans
Auto, Boat, RV and
Personal Loans
Lines of Credit
Investing With
Comerica Securities
Insurance

**It's easy to apply:**

- Click here

- Call **1-800-535-2760,**
 24 hours a day, 7 days a week

- Stop by any Comerica branch
 or ComeriMart location

**Comerica Home Equity FlexLine
Advantages:**

- Low, interest-only payments
- Flexibility to convert any part of your
 variable-rate credit line into a fixed-
 rate loan–payment option at any time
- Interest may be 100% tax
 deductible**
- Equity Line Access Card good
 anywhere Visa® is accepted
- Open a Comerica Personal Regular
 Checking account that's free for as
 long as you have your Comerica
 Home Equity FlexLine***

**3.9%** APR*
INTRODUCTORY

AS LOW AS
**4.5%** APR*
LATER

Getting a home equity loan is a big decision,
but it doesn't have to be a big hassle.
At Comerica, we've simplified the process:

- Easy-to-understand loan options
- Simple paperwork
- **No closing costs or application fees**

PLAINTIFF'S EXHIBIT 18A

PLAINTIFF'S
EXHIBIT
18 A

DEFENDANT'S EXHIBIT 10

 

7

DX10

**PLAINTIFF'S EXHIBIT 10**

| Financial Institution | Deposits Inside Michigan 2001* ($000) | Home Equity Product |
| --- | --- | --- |
| Comerica Bank | 21,696,992 | Comerica Home Equity FlexLine |
| Bank One | 16,190,804 | Bank One Home Equity Line (sm) |
| Fifth Third Bank | 11,342,817 | Fifth Third Equity FlexLine (sm) |
| Standard Federal | 9,696,668 | No Name/Home Equity Line of Credit |
| National City Bank | 8,855,198 | Equity Reserve (sm) Line of Credit |
| Michigan National | 7,913,191 | No Name/Home Equity Line of Credit |
| Charter One | 4,241,221 | No Name/Home Equity Line of Credit |
| Huntington Banks | 4,041,422 | Huntington Home Equity Line of Credit |
| Citizens Bank | 3,841,674 | Citizens Bank Home Equity Line |
| Flagstar Bank | 3,332,852 | No Name/Home Equity Line of Credit |
| Republic Bank | 2,527,504 | No Name/Home Equity Line of Credit |
| TCF Bank | 1,394,980 | TCF CommandCredit Plus |
| Chemical Bank and Trust Company | 1,221,563 | No Name/Home Equity Line of Credit |
| Monroe Bank & Trust | 1,044,295 | No Name/Home Equity Line of Credit |
| Chemical Bank Shoreline | 837,050 | No Name/Home Equity Line of Credit |
| Citizens First Savings Bank | 625,931 | No Name/Home Equity Line of Credit |
| Wells Fargo Bank Michigan, National Association | 618,125 | EquityLine @ Account |
| Keybank National Association | 599,858 | Key Equity Options® Account |
| First State Bank of East Detroit | 577,269 | No Name/Home Equity Line of Credit |
| Sterling Bank and Trust, FSB | 523,435 | No Name/Home Equity Line of Credit |

* June 30, 2001 FDIC Market Share Report

## PLAINTIFF'S EXHIBIT 11A

Third Party Uses of FlexLine Cited in Declaration of Abbey Remley

| Bank/Credit Union | Term Used | Product/Service | Evidence of Use Prior to September 1, 1998 | Market Area | Scope of Use/Restriction on membership |
|---|---|---|---|---|---|
| First Financial Bank of Arkansas | Flexline | Home equity line of credit | None. | El Dorado, Arkansas | 6 bank branches. |
| Fahey Bank | Fahey Flexline | Home equity line of credit | None. | Marion, Ohio | 4 branches around Marion, Ohio. |
| Bank of Hawaii | Equity FlexLine | Home equity line of credit | None. | Hawaii | $14 billion in total assets. The term "flexline" does not appear on their website. Using the term "Bankoh Home Equityline" on website. |
| United Cooperative Bank | Home Equity Flex Line | Home equity line of credit | Yes. Website, dated December 24, 1997 advertises a Home Equity Flex Line. | Western Massachusetts (Hampden, Hampshire, Franklin and Berkshire counties) | 10 branches. Must live or work in Hampden, Hampshire, Franklin and Berkshire counties. |
| Wheatland Credit Union | Flexline | Home equity loan | None. | Lancaster County, Pennsylvania | Has a main office and 1 branch. Must live, work, worship or attend school in Lancaster County. $42 million in total assets. |

| Bank/Credit Union | Term Used | Product/Service | Evidence of Use Prior to September 1, 1998 | Market Area | Scope of Use/Restriction on membership |
|---|---|---|---|---|---|
| First Security Bank | FLEXline | Home equity line of credit | None. | Byron, Minnesota | Has 1 office in Byron, Minnesota. $30 million in total assets. |
| Northwest Federal Credit Union | FlexLine of Credit | Business revolving credit | None. | Herndon and Vienna, Virginia | Membership is limited to agency personnel, DOD, NIMA and other US government agency personnel, retired Agency personnel, member companies and select employee groups. Lori Mason of Northwest confirmed on 11/4/02 that the credit union does not currently have any product or service called "flexline" (discussion with Ms. Charlebois). |
| AmSouth Bank | Business FlexLine | Small business line of credit | Yes. AmSouth Bank has a registered mark – BUSINESS FLEXLINE (registered in April, 1995). | Tennesse, Mississippi, Alabama, Georgia, Florida | $38 billion in total assets. |

AnnArbor1

| Bank/Credit Union | Term Used | Product/Service | Evidence of Use Prior to September 1, 1998 | Market Area | Scope of Use/Restriction on membership |
|---|---|---|---|---|---|
| Northwest Resource Federal Credit Union | Flex-Line | Personal line of credit | Yes. Website, dated 2/7/98 advertises a Flex-Line. | Portland, Oregon | Must live, work, worship or attend school in Portland, Oregon or work for a company or belong to an organization serviced by the credit union. |
| Flagship Bank | Home Equity FlexLine | Home equity line of credit | None. | Shrewsbury, Worcester, and Leominster, Massachusetts | 7 branches. |
| Newport News Shipbuilding Employees' Credit Union | FlexLine | Revolving signature loan | None. | Newport News, Virginia area | 8 locations in the Virginia peninsula. $600 million in total assets. Membership limited to those who live and/or work in the Newport News area. (78,000 members). |
| Webster Five | FlexLine | Home equity line of credit | None. | Webster, Massachusetts | 8 branches. |
| National Cooperative Bank | FlexLine | Business line of credit | None. | Hillsboro, Ohio | $369 million in total assets. Becky of NCB said on 11/4/02 that they do not have any product or service called "flexline" (discussion with Ms. Charlebois). On 11-6-02 Alysha Schaefer confirmed same. |
| United Southern Bank | FlexLine | Line of credit | None. | Lake County, Florida | 10 offices. |

| Bank/Credit Union | Term Used | Product/Service | Evidence of Use Prior to September 1, 1998 | Market Area | Scope of Use/Restriction on membership |
|---|---|---|---|---|---|
| First of Negaunee | Flex Line | Home equity line of credit | None. Website shows first use of Flex Line was in February 2001. | Negaunee and Marquette, Michigan | 7 locations. 112 million in total assets. |
| Penair Federal Credit Union | Flex-Line of Credit | Home equity line of credit | Yes. Website dated 3/2/97 advertises a "Flex-Line." | Pensacola, Florida | $541 million in total assets. Membership limited to Civil service and military employees assigned to military bases in the area and other employee groups. |
| Digital Federal Credit Union | FlexLine | Business line of credit | None. | Marlborough, Massachusetts | Membership limited to employees of Digital Equipment Corporation and other companies. |
| FAA Eastern Region Federal Credit Union | Flex-Line | Personal line of credit | None. | New York, New Jersey, New Hampshire and Virginia | Must be employee of a member company. |
| Coatesville Savings Bank | FLEXLINE | Home equity line of credit | None. | Coatesville, New Holland and Oxford, Pennsylvania | 3 offices. |
| Albemarle First Bank | Flexline Protection | No description of the "loan product" entitled "Flexline Protection" | None. Bank first opened in December 1998. | Charlotte, VA | 3 branches, and $95 million in total assets. Mr. Neil Davis of Albemarle First Bank stated on 11-4-02 that they do not have anything called "flexline." |

| Bank/Credit Union | Term Used | Product/Service | Evidence of Use Prior to September 1, 1998 | Market Area | Scope of Use/Restriction on membership |
|---|---|---|---|---|---|
| Bank of Lancaster County, N.A. | Sterling Flex Line | Personal line of credit | None. | Lancaster County, Pennsylvania (and adjoining communities) | 30 branches. |
| ORNL Federal Credit Union | Flex-Line HELOC | Home equity line of credit | Website dated 12/19/96 advertises "Flex-Line." | Knoxville, Tennessee area | Must be a member.<br><br>70,000 members.<br>12 branches.<br>$580 million in assets. |

AnnArbor5

PLAINTIFF'S EXHIBIT 12

PLAINTIFF'S
EXHIBIT
12

### Use of the term "flexline" to refer to products other than financial products/services

| COMPANY | PRODUCT NAME | DESCRIPTION |
|---|---|---|
| J. Hvidtved Larsen A/S | JHL FlexLine® | Supplier of professional solutions within sewer cleaning tankers. JHL FlexLine®, the combined jetting and suction tanker of the future. |
| Fire Fighter Products, Inc. | Flexline Industrial Rack & Reel Hose, Flexline Industrial Double Jacket Fire Hose, Flexline Industrial Mine Hose, Flexline Municipal Fire Hose, Flexline Single Jacket Fire Hose and Flexline Wash-Down Hose | Various Fire Hoses |
| Rosenberger LEONI | FlexLine® Connection technology for wireless communication systems | Connection technology for wireless communication systems |
| Pro-Line | Flex-Line Workstations | The Flex-Line Panel System allows tops and accessories to be supported off both sides to afford additional workstation flexibility-single and/or dual sided placement of stations. |
| JUKI Automation Systems | FlexLine CAD Software | FlexLine CAD is a data conversion system that reads a text data file created by various CAD systems or a production file created by another manufacturer's mounter, and then converts them to data file in JUKI KE-Series and/or HLC format. |
| Thompson-Leigh | FlexLine | Mirror cabinets with fluorescent tubes or halogen lighting. |
| PetVet Supply | Flexline Outfitters and Wellness | Pet Supplier |
| HortiMax | FlexLine GPK 2000 Climate computers | Flexline is the name of the complete range HortiMaX climate and irrigation computers for (middle sized) large companies. Climate computers designed for modern horticulture. |
| Bruck Lighting Systems | Flex-Line Track Connector | The Track Connector allows two Flex-Line tracks to be coupled together forming an optically smooth continuous track run. The connector also provides full electrical convection of the joined tracks. |
| TL Electronic GmbH | FlexLine P12 / P14 / P15 | Computer Products |
| Packexpo.com | FlexLine 60 Labeler | The New Smart applicator enables labeling of multiple size products with a single labeling machine. |
| Neptco | FLEXLINE® Products | Chemical: Thermoplastic Polymer, Fiberglass Matrix |
| Altaindustries | Flexline | All purpose pad ideal for working on delicate surfaces. Made with Du Pont Cordura® Nylon. |
| US Filter | FlexLine | Nonbuoyant tubular diffuser by USFilter/Diffused Air Products Group. |
| HyGenic | Flexline | Two flexible tubes (vacuum and pressure) connected to the machine and laid across the floor to the ball poll for conveying balls back and forth. |
| Packless Industries | Flexline Connectors | Three types of end fittings; flexible tubing, wire braid & end fittings. |

AnnArbor 64857_1